We are happy to hear argument in our first case this morning, the University of Maryland, in number 15, 4272, United States v. Lloyd. Good morning, your honors. May it please the court, my name is Jennifer Mayer, and along with Richard Fincy, we're here representing the appellant, Bernardo Lloyd. We're here today seeking a reversal of Mr. Lloyd's conviction for involuntary manslaughter based on a violation of his Sixth Amendment right to a speedy trial. Alternatively, we are seeking a review of his sentence and conviction, which was entered after a three-day jury trial in the District Court in Greenbelt. The facts underlying this case are based on a tragic motor vehicle accident that occurred on the Baltimore-Washington Parkway, in which Mr. Lloyd's vehicle struck the rear of the decedent's vehicle. We have framed the three issues on appeal as follows. One, applying the de novo review to the facts surrounding the 15-month pre-arrest delay. Mr. Lloyd's Sixth Amendment right to a speedy trial was violated. Excuse me, don't we review the District Court's findings of fact with deference to the District Court? This would be the only situation I've ever heard of where we don't, so. The finding of fact is generally reviewed with deference. However, a constitutional violation is reviewed de novo. This court can make an independent assessment of the Barker-Wingo factors. But the facts underlying it. The court can accept the facts found by the District Court, that's accurate. The de novo review of the Barker-Wingo analysis in this case would be whether Mr. Lloyd's Sixth Amendment right to a speedy trial was violated and his conviction should be reversed and his indictment dismissed. The second issue is whether the District Court erred by allowing one of the government's expert witnesses to testify as to the cause of the accident and the actions of the other driver when he had not performed an accident reconstruction. And the third issue is whether Mr. Lloyd should have been given a two-point reduction in his U.S. sentencing guidelines based on his acceptance of responsibility. We'll spend the majority of our time this morning on the first issue of the speedy trial. In Barker v. Wingo, the Supreme Court declared that a trial delay which results in an inability of the defendant to present a defense should be taken very seriously because such a delay skews the fairness of the entire system. Indeed, in this case, the trial delay skewed the fairness of the entire system. There was an inordinate 15-month delay in this case. And how were you prejudiced? Your Honor has gotten to the heart of the issue here. The facts underlying the prejudice are not disputed. The government destroyed the vehicles involved in this accident either in the weeks leading up to the indictment or in the 15-month delay. Well, the court found it was that the evidence was destroyed prior to the indictment. And respectfully, there's nothing in the record that would support that. The government was in the sole position to present evidence as to exactly when they were destroyed, and it failed to do so. What we do know is that Mr. Lloyd testified he saw his vehicle in May or June of 2012, and the indictment was returned on June 25, 2012. But that goes back to Judge Motz's question about deference to the facts as the district court found them. There is deference, but there was nothing in the record to support that finding that it happened in the six weeks. No one testified that it happened during that period. And it's this court's ability to say it was either in those six weeks or in the 15 months. We don't have any evidence either way. Was it the district court's finding that it happened in those six weeks, or was it the district court's finding that even if you had an expert, you wouldn't have asked for them before the vehicle was destroyed? I believe the district court found that it happened in those six weeks. The evidence showed that we asked for access to the vehicles within one month of being arrested. So I think this court could fairly assume that had he been arrested earlier and there wasn't that 15-month delay, he would have asked to see those vehicles within one month. What you did have was the two witnesses for the government on this, one of whom had a chance to examine the site and the car, and the other one who didn't. And it seemed to me, and I read this pretty carefully, that your cross-examination, I don't know if you did it or your colleague did it, but the cross-examination of the government's witness who had seen the site left me with the conclusion that that witness was more effective for you than for the government. Was there anything that you wanted to get from that witness that you didn't get? Yes, we wanted to get an alternative cause of this accident. Yes, but your man, who you proffered to the district court pretrial, wasn't really able to do that either. Exactly. Well, he wasn't even able to do it hypothetically. He wasn't able to do it because he could not examine the vehicle. Yes, but what he said was, examining the vehicle, I could do all these things, but he didn't say how they would – well, let me put it this way. Did you have both of the reports from the government witnesses? We did. At pretrial? Yes. So you had what they had concluded. We had what they had. And you could cross-examine, and you did, and you could examine your witness, and you could have brought out what it was that they didn't do, the man who did examine the car didn't do, right? That's correct, Your Honor, but what we could not do, and what Doggett recognizes is essentially you never know what you didn't know. We don't know what our expert would have found had he had access to these vehicles. We don't know if he would have said there was another contributing cause. He would have said pre-accident braking, roadway conditions, swerving, a mechanical defect. We have no idea what our expert would have found, and that's the heart of the prejudice issue here, and that's actually why Doggett allows the court to presume prejudice. Well, Doggett had one feature that your case does not have, does it? One big feature. The length of the delay? Indeed. The length of the delay in Doggett was eight-and-a-half years. In our case, it was 15 months. However, this was a very straightforward case. What if the delay had been 11 months? If the delay had been 11 months, I believe it's still presumptively prejudicial. The Fourth Circuit has found that eight months is enough. Approaching a year. Approaching a year, but in a case of five months. What if it had been five months? We wouldn't even be looking at this for prejudice. We may not have gotten through the threshold issue. However, there's another issue here, and that's the government's reason for the delay. This was not government neglect. This was an affirmative decision. No, but it wasn't government malfeasance. It was negligence. I'm not sure the court can characterize it as negligence. If you line it up with all of the cases on this issue, I can't find one that would say that this was anything less or anything more than negligence. If you have a case that says that, go to it. Well, I'd be happy to distinguish this case from the negligence cases. This is not a case of overcrowded dockets or lack of prosecution. No, those are cases where the government has a reason. And they're not negligence. The government wasn't negligent in those cases. We have three kinds of cases. One's where the government has a reason for the delay, and one's where the government, through bad acts, caused the delay, and then we have the middle ground, the negligence. The neutral reasons. That's correct, Your Honor. And let's compare it to Clark, the case the government cited yesterday in its supplemental authority, that 11th Circuit case, where there was a mistake that caused the delay in serving the arrest warrant. And the 11th Circuit found that that was a neutral reason. That was negligence, a mistake. This is not a mistake. This is a decision to put this case on a lower track than other cases and not take any action toward serving this warrant. I think that's a generous reading of the record for your side. I think you could as easily call this a mistake in not communicating and not executing promptly. But be that as it may, if that's the best case for the government, what's your best case? The best case regarding the delay? The best case, period. The case upon which you would hang your hat. If Clark is the best case for the government, I think we would go to Woolfolk, which says an eight-month delay in a more complex case than this one creates prejudice. Okay, so tell me what was the prejudice there? The prejudice was these vehicles were destroyed. No, no, no. In the case on which you were relying, the case that you say is the best for you, we follow it, you win. Well, in Woolfolk it was an eight-month delay, but the court did not find prejudice in that case. That's just what I'm trying to tease out from you, the case that's closest to yours on all four factors. And I just haven't found one. Frankly, Your Honor, there is not a lot of case law from this circuit or any others where defendants win this issue. Indeed. The Supreme Court's eight-years case was sort of a marker, and courts haven't been able to, and maybe you can explain that to me, but courts haven't gone there. Because it's very difficult to show actual prejudice, and docket allows you to presume prejudice when there's government neglect. You don't need to rely on that here, because we have these vehicles being destroyed. You don't think you could presume prejudice? I do think you could in this case. There was government neglect at best. Do you have a long enough period to presume prejudice? Doesn't docket tell us that this is a floating, how much prejudice you have to prove goes along with how long the period is? In other words, as the period increases, you have less burden of proof that there was prejudice. Absolutely. This is a four-part test, and the court is required to weigh all four parts of it, and one factor being stronger would allow another to be weaker. A 15-month delay is not the greatest delay the court is going to see in these cases. However, the facts were simple. The government intentionally did not serve this warrant, and we know, we had an expert who said he couldn't do his job, we couldn't present a defense because he didn't have a defense. But what about the fact, I go back to the fact that the district court found as a factual matter that any evidence lost to the defense was lost in the period of time between the accident and the indictment. The delay didn't occur until after the indictment, so those two things can't even be connected. Well, Your Honor, we know that those vehicles were still around because Mr. Lloyd testified that he saw his, so we know at government's best case that those vehicles were destroyed in the five weeks between... So you're asking us to find that the district court clearly erred when it found as a factual matter that the evidence was lost between accident and the period of time between accident and indictment. There's no evidence in the record to support that, and the court can do an independent weighing of the factors. The court can either accept that factual finding of the district court, or it can look at the record and say there was nothing to support it, so we're not going to give that particular finding much weight, and we're going to look at all the Barker v. Wingo factors and say even if it was delayed, excuse me, destroyed during that five-week period, there's prejudice. With that, I'll cease my co-counsel for our remaining issues. Good morning. May it please the court, Richard A. Fincy, co-counsel on behalf of Mr. Lloyd in this matter. Your Honor, hand-in-hand with the issue that the defense was unable to present an expert witness with respect to the cause of the accident due to the inability to reconstruct the accident in this case. Similarly, the defense objected to the government presenting a witness, an expert witness, to testify as to the cause of the accident because he too could not reconstruct the accident situation due to the vehicles being destroyed. You didn't need an expert to determine the cause of the accident in this case, did you? It was due to severe impact to the rear of a Ford truck. Yeah, from the standpoint of exactly how the two vehicles came together, clearly the cause of the accident was a rear-ending, you know, striking of the vehicles. Well, your client... No doubt about that. Your client, didn't he nail himself on that issue in the record in 302 to a few places later? He said that the Nissan approached him from the rear going very fast, right? Yes, sir. And then he said he moved over and it was gone because it was going really fast, his words. And then he said, I pressed on the gas. So if you admit that the Nissan is going really fast and you pressed on the gas, you're going really, really fast. Yes, sir. Right? He was going really fast. And he hit... And witnesses said, look, they were zigzagging. That's his own testimony from direct... not cross, but direct. What expert would you need? And he hits the back of the truck and the truck flips over and the occupant of the vehicle dies. What's the expert for? Well, I mean, the expert is to somehow I'd like to quote this court. It was for the purposes of the government finding a witness who would... I'm looking for my quote that I was prepared to basically provide a transmutation of simple fact testimony. That's what the expert was called upon to do in this case is to take that fact testimony and... The client admitted that he was going more than really fast. He said, I pressed on the gas. Was he trying to chase him? What was that? That's what he said. You can't... Your case can't rise higher than your own direct testimony. What would an expert do for you? Because it's not in dispute. So you're referring... I'm referring in my argument to the government's use of the expert, but you're suggesting the defense use of the expert. I'm looking at direct examination of Mr. Lloyd. Let's talk a little bit about that, Judge. With respect to defense use of the expert, what would we hope? First of all... You're getting off on my question. Go ahead. Get to me wherever... You take me wherever you want me to go. What we want to know is how an expert... I mean, I thought you did a pretty skillful job cross-examining their expert. But how would your expert have helped you get beyond the fact that this device in the car was stuck at 79 miles an hour and your expert testified out of his own mouth, as Judge Gregory said, that he was going very fast? My client did. And I appreciate the compliment. But what... Let's talk about what their expert did and I can tell you what our expert might have been able to do. Their expert testified there was a 41-mile-per-hour change in velocity as a result of the accident as measured by the airbag control module in the Lexus, okay? 41 miles per hour. Had no idea how fast the truck was going because there was no testimony. There was no airbag control module. No way to know that. So by that first measure of speed, he doesn't know how fast that 41-mile-per-hour change in velocity... You know, what is it from? What is it from? 10 miles an hour? So my client was going 51? Or was it from 70 miles per hour and my client was going 111? We knew he was going 79. We know that the Lexus airbag control module had 79 as its maximum speed that it would capture. So that is correct. All going up to the incident. 79, 79, 79, 79. So if mine is reading, if it's reading 79 and 79 is as high as it can go and when it breaks, it's going... When it stops, it's going 79. That's an indication that it went higher than 79. Maybe not 100. Maybe only 80. With the possible... Again, because the vehicles weren't reconstructed, Judge, nobody looked at the computer on the Lexus, not the airbag control module, but the computer, the minimal computer was an older model Lexus that talks about things, settings. For example, wheel size. There are wheel sizes that can be... The tire sizes are different. Therefore, that speed may not be accurate. It's measuring how many times the axle is turning. It's not measuring based on the tire size. The smaller the tire... I hope I get this right. The smaller the tire, the faster the speed that's being measured. The larger the tire, the slower the speed is going to actually be. So again, this is something that the fence could not get to and the government didn't either because the vehicles were destroyed. But you did not object to their expert's conclusion that your client was going 100 miles an hour. You said, we have no objection to that. What you objected to was the conclusion that it was the sole cause and that the truck did nothing to contribute to the accident. That's exactly what you did. Is that correct? That is correct. Then why are you asking us to say this prejudice because the expert testified to the speed being 100 miles an hour when you conceded that? We're objecting that he would testify as to the cause of the accident, not to the methodology which he demonstrated relative to speed. It seems to me the only piece you have in terms of an expert would be that your expert would have been able to say what the speed of the truck was at the time of the impact. Other than that, I don't, are you saying that an expert would have been able to do that? We believed, and we had evidence through our client that the truck had decided to exit B.W. Parkway right at that point, that he had put on his brakes and was attempting to move to the right directly in front of my client's vehicle, which what led to the under, the tragic, the reason this happened in this manner and it was so tragic is there was an under-riding of the truck by my client's, rear of my client's vehicle, which caused the truck to lift as it under-rode and then start to flip. And that was what tragically led to the death of the driver of the truck. And so how the Lexus under-rode the truck, one of the many ways that it can is through braking on the truck, which causes the nose of the truck to go down, and braking very briefly of the Lexus, it would go right underneath, and you have that whole collision scenario. Why didn't you put an expert on to save him? Because he couldn't. Why couldn't he? Because he, well, I mean, frankly, because he told us he couldn't. No, no, it's what he told you, that he couldn't reconstruct the accident. Right. He didn't feel he had a scientific basis. He said, well, this is a common way this occurs. He had our client's statement as to how it occurred, but he did not have the ability to reconstruct the accident and would not put his expert opinion into the record. And what did he need to formulate a conclusion? Well, the main thing he needed was the ability to examine the vehicles for what he called imprint and... He called it crush profile. He needed to distinguish between contact versus induced damage. Why didn't you bring a spoliation motion? Spoliation has nothing to do with speedy trial. Why didn't you bring a spoliation? That's another possibility. Our goal was... That's the only possibility, because you're now speculating as to what prejudice exists because you don't know what you would have found. But spoliation is no fair game. We don't have the vehicle. You get nothing, because their expert did just supplement what the park officer did, so therefore you can't use any of that in a spoliation motion if you had won that, but you didn't make the spoliation motion. Well, what he preserved was the airbag control module data. That was preserved by Officer Bente Wegner, the first reconstruction expert. So that was preserved from that point in time. What we didn't get to do was to compare the vehicles in those circumstances. But let me just finally... I think, actually, I've been pretty generous about your time. Okay, thank you, Judge, and I'll pass on to the government. Thank you. Thank you very much, Judge Motz. Good morning, may it please the Court. My name is Sujit Raman. I'm the appellate chief of the District of Maryland. Can you talk up just a little more with the microphone closer to you? I hope the Court will hear me okay. May it please the Court. This Court should affirm. I will focus my argument, Your Honors, on the first issue in this case, the constitutional speedy trial issue. And I would like to walk through the Barker factors. I think the Court obviously needs to do that in resolving this matter. We don't dispute under Factor I that the 15-month delay in this case does trigger a Barker analysis. I would point out, though, Your Honors, there is language in Barker about Factor I, if you've got enough time that is presumptively prejudicial. But the Court needs to keep in mind that's only with respect to Factor I. So once you've got that 15-month triggering mechanism, that does not mean that across all four factors there's a presumption of prejudice. Well, I don't think they've claimed that. Very good, Your Honor. On the second factor, I'll move very quickly. Judge Motz, as you pointed out earlier, I think it's quite clear the government was negligent. It did not act deliberately in this case. On the other hand, there certainly was not a valid reason for us to delay the 15 months in arresting Mr. Lloyd. I'm not proud of it. I'm not standing here defending it. We should have arrested him more quickly. Clearly, it was a case of government negligence. But as I think Doggett points out, it's a neutral factor, or it weighs very lightly in favor of the defendant. This is not a case of deliberate strategery, so to speak. So I would like to focus on the third and the fourth factors. As the Court has observed at the very beginning, the fourth factor, prejudice, is really the most important one. I will certainly address that, but I don't want to skip over factor three. Because I think in many ways, that's what makes this case quite unique. As the Supreme Court observed in Barker, it is up to the defendant to assert his speedy trial rights. Remember we were talking about findings by the district court. The district court found that he had, in fact, invoked his Constitutional Speedy Trial Act, his Constitutional Speedy Trial Rights. And the government didn't dispute that. That's the cases we take. That's absolutely correct, Judge Motz. We do not dispute that Mr. Lloyd asserted his rights, but I do think you need to go back to Barker. And this is very important. This is at page 2192 in the Supreme Court Reporter, page 530 in the U.S. Reporter. The Court is talking about this third factor. And it says, whether and how a defendant asserts his right is closely related to the other factors we have mentioned. The strength of his efforts will be affected by the length of the delay, and most particularly by personal prejudice. The more serious the deprivation, the more likely a defendant is to complain. So I think this is very important, Your Honor. Mr. Lloyd was arrested in September of 2013, asserts his speedy trial right the next day, you know, when he's arrested at his arraignment. He does nothing for a year. He moves to dismiss his... The government has tried to make this argument at every stage. And at every stage, everybody says to you, the government, it's the first 15 months that we're talking about. That's right. He invokes his right right away there. There's no claim about lack of speedy trial rights for the other period. So I think that we understand that you think that's important. The district court didn't think it's important. The case law doesn't seem to think it's important. We're only talking about the first 15 months, and right as soon as he could, he invokes his right. So I think you're left with the fourth factor. Yes, Your Honor. I'm happy to move to the fourth factor, though I probably will come back to the third one at the end. But let me focus on prejudice. Yes, Your Honor. Let me focus on prejudice. In terms of prejudice, the reason why there is no prejudice in this case is Judge Titus found as a factual matter, Mr. Covert, who is the expert that the defendant hired at the pre-trial motions hearing, testified that actually he never said that he couldn't do a reconstruction in this case. He said he couldn't do it in this case. No, with respect, Your Honor. He said you can do it in some cases. You can't do it in this one. My understanding of the record is that when the defense lawyer showed him photographs and the question then became, you know, is this essentially an adequate substitute for looking at the vehicles? He said, correct. It is not sufficient for me just to look at photographs and reconstruct the accident. I think Judge Titus was exactly right, having listened carefully to this evidence, to find that Mr. Covert never actually said, I am incapable of doing an accident reconstruction here. And that actually does tie in, Your Honor, and I don't want to lose the court's focus here. It does tie into the third factor, right? Mr. Covert was hired right after Mr. Lloyd, the defendant's arrest. He looks at the vehicles, or he tries to look for the vehicles, in October of 2013. Mr. Lloyd did not move to dismiss the indictment on speedy trial grounds at that time. So his expert is telling him, Mr. Lloyd, I need the vehicles. I can't find them. I don't have them. By the way, there's nothing in the record to suggest that they were destroyed. What do you mean he didn't move on a speedy trial ground? So he did not move to dismiss the indictment and assert his speedy trial rights when his expert told him, I can't do a reconstruction. He waited one year, Judge Watts. He waited until September of 2014 before he moved to dismiss the indictment, a year passed before. And that's my point, and I think the court's sort of seeing what I'm saying now. It took him one year to assert his rights. He thought that you all were going to drop the case. There was negotiations. There were pre-negotiations. That's his prerogative. He doesn't have to follow the government's timetable. The government certainly didn't follow his timetable. No, that's right. But he didn't sort of assert his rights until really three months before trial. The trial's in December of 2014. He files the motion to dismiss on September 18th of 2014. So a year has passed between when he was arrested and when he knew he had been charged with involuntary manslaughter. He did nothing. And so what's the point? My point is that it's strategic. And this is what I'm saying under Barker. The Supreme Court is very clear about this. But what difference does that make? Well, it shows that he's not right. If he did it, he asserted the right right away. Right. I think that... I guess I'm just speaking for myself, but I just don't think you go anywhere on the third factor. So I would be interested in where you find support in the record for the district court, for the district court's findings about when this was destroyed, that you told me you had. Yes, Your Honor. Let me just grab the joint appendix. Or that this expert could do a reconstruction of this vehicle. I thought it was pretty clear that he said he couldn't. What my understanding, Your Honor, at page 122 is Judge Titus' finding. Let me just... No, no, no. I'm asking for the... The testimony. The testimony that supports such a finding. I apologize, Your Honor. I didn't have this. I thought you'd said that the way you read the record was that. I wanted you to help me read the record. Yes, Your Honor. This is during Mr. Cover's testimony. If you look at page 79, for example, which is the redirect, can you tell us about the circumstances under which you would be able to do one, that is reconstruction, without seeing the vehicles? He says sometimes it's just simple speed. But when you have a case of who crossed the line, blah, blah, blah, you can't do one. Right. I mean, he says you can't do one here. Right? Well, he says you must have a factual and scientific basis as to the point of impact. And by the way, Mr. Cover did have the total station fully complex diagramming of what happened at the scene. Right? So what he did have is the total station, which of course is kind of a technical thing, but it's a three-dimensional survey of everything that happened and is preserved at the evidentiary site. I think that's a different point, though. That point is he had all he needed. Right. He says these are not just me. These are industry standards, guidelines, and protocols that you will find in any authorized reconstruction text. I don't think there's anything in here that judge Motz, where he says I can't do it. Right? He says these are just not me. These are industry standards. He said it on direct. You all cross-examined him and left him with, and there are certain conclusions that can be made, but that you cannot. And then you interrupt and say I'm nothing further. So he comes back on redirect and they're saying they're not. But I'm interested in what you, when you're writing your brief, and you go to the record and you find the support for the district court's finding. Yes, Your Honor. Where do you find that in the JA? So where I find it is, again, at the top of page 72 of the joint appendix. So this is on the direct examination. Yeah. Right. At the very top there, the question is, were the photographs in this case sufficient to replace an actual inspection? Mr. Harber says no. But that's only about the photographs. What about everything else that this expert had? He had the total station. He had the witness statements. He had the ACM. He had the airbag control module, which is a high-tech, essentially a black box, of what's going on in that car, that Lexus, before and at the time of impact. So all Mr. Harber says is I can't do this based on the photographs. So it's sort of a negative implication because he only said according to you. That's right. That's the best you have. Well, I think that's a very strong point. And then I have the expert at trial, the government's expert at trial, Corporal Russell, who said no, there is nothing in the sort of industry standard saying that you must inspect the vehicles. In fact, Mr. Cover testified, I don't want to switch back, Mr. Cover testified at the pretrial motions hearing that half the time he doesn't have access to the vehicles. Half the time he's hired well after the accident and he's called in to do a reconstruction and he's perfectly able to do it. So perhaps it is a negative implication, Judge Motz, but I don't think there's anything directly in the record where Mr. Cover says I could not do this in this particular case with everything that I had, not just the photographs, but with everything that I had, I physically could not do a reconstruction. And Judge Titus then made a factual finding. Having listened to this testimony, having reviewed the materials that were provided to him, he made a factual finding that, quote, I didn't hear him say he's incapable of doing a reconstruction without looking at the vehicles. We respectfully would submit that factual finding is owed considerable deference by this court. And it's not clearly erroneous because there was nothing in the record contradicting Judge Titus' finding. Your Honor, we did not destroy the evidence. I heard that a few times in the opening argument. There was nothing in the record to say that the government destroyed the evidence. What happened is that the cars were released to the insurance companies. And I don't understand why there is no record of when the cars were released to the insurance companies. Why the government doesn't have a record of releasing evidence? I think at the time of the pretrial motions here, Your Honor, we didn't anticipate that that would be an issue. And the agent, from my reading of the record, didn't have it directly on him at the time. But why couldn't you go find it? I mean, why isn't it in a record? You go to the library. If you don't have the case right away, you go to the library. You go to your machine and you get the case. Why isn't there a record somewhere? I think it cuts both ways, Your Honor. It may cut both ways, but why isn't there one? Aren't there records of when the police released their vehicles? I think there may be. What I'm saying is this record does not reflect when the cars were released. And that's all we can really work off of, of course, is the record before this court and the record before Judge Titus. And what I'm submitting to the court is the record is silent on that. But it would be your record, right? Yes. So I don't understand exactly how it cuts both ways. It wasn't that they didn't produce the record. Well, Your Honor, you might recall, when Detective Humberson is on the stand, he's cross-examined by defense counsel. And defense counsel actually never makes the final point, I think tactically, quite strategically, because they didn't know what it was going to say. He's sitting on the stand and they ask him, well, is it in your record somewhere? He says, yeah, it's in my records. I haven't looked at it. Well, is it with your records that you have today? Yes, it's somewhere in my computer. Defense never pushed and actually asked, when were these items released? Because they weren't sure what the answer would be. So strategically, they didn't go that last mile. And I don't fault them for that. Maybe that was a good strategic decision. But the result is, and this is important, the result is that the record is incomplete and it's very difficult for a defendant... This was at the pre-trial hearing? Yes, Your Honor. Were you there? I was not. Boy, oh, boy, if I'd been there and represented the government, I sure would have looked at that. I really don't understand why nobody looked at it. Perhaps we should have, Your Honor, but it's not in this record. I guess my point, though, is that it's almost impossible for a defendant to show actual prejudice when he can't show that there was any particularized prejudice to his case. I mean, that's exactly the point. If they had drilled down on that, Judge Mott, I don't disagree with you. It would have been much stronger for them to be able to say, my gosh, the cars were released before my guy was even notified of the charges. But if they don't create the record, then they cannot come up here and show particular prejudice. Well, the Supreme Court talks about the possibility of an impaired defense. Yes, Your Honor. And I'm not sure whose burden it is to be showing prejudice, whether the government has to rebut prejudice or the defendant has to prove prejudice. The Supreme Court is very unclear on that, I would say. A little unclear, Your Honor. I would suggest under docket, clearly. Nobody had to prove prejudice in that case. That's what the Supreme Court held. And that's exactly my point, Your Honor. Because the delay was eight and a half years, even though it was just negligence on the government's part, it was so long. The court said, we must presume prejudice here, and it's up to the government to rebut. Actually, they dismissed it in that case, because it was just so long. Now, in a case that's only 15 months, I have not found a single case where the burden has been shifted. Not one, right? Well, I don't know what you talk about shifting, because I don't know where the government has told us where prejudice begins. Whether, as I say, they have to prove prejudice or you have to prove a lack of prejudice. Well, they have to prove prejudice. What case is that? I would say Barker versus Wingo. I would say Robinson versus Whitley, which is a Fifth Circuit case. It was a 12-month delay in that case. Clark, which is the 28-J letter that I cited the other day, is a 14-month delay. And the 11th Circuit squarely held that it's the defendant's burden. When it's only 17 months in that case, this case is less. I guess I'm looking for a post-Doggett case that has the same Doggett is interesting because of the eight years, but also because the delay period is the same period as this one. It occurs at the same time. I think Clark is right on point, Your Honor. Clark is post-Doggett. But it's out of circuit. It is out of circuit. And it's not Supreme Court. That's absolutely correct. It is out of circuit. But I think it's persuasive, and here's why. You know, it's really on force. I mean, that's a case where the marshal service, like this case, just didn't go serve the warrant. It was just utter negligence on the part of the government. It was 17 months, which is longer than the 15 months at issue in this case. And the court essentially went through this analysis and held under Doggett that it's still the defendant's burden to show particular prejudice. And I would submit to the court again, there is no particular prejudice in this case where the expert never said, I cannot do this reconstruction. He never said that. It's not in the record. And Judge Titus's factual finding is absolutely correct. It says something, and I don't want to get caught up in this, Judge Moss, but I just want to make this point. It says something that when the defendant's expert tells him, I don't have access to the card, they were never destroyed. They were released to the insurance companies. And as far as I can tell, Mr. Lloyd can still get access to those cars today. It's his insurer. There's nothing in the record to suggest that they were destroyed or that he never could have gotten access to them. Judge Greger, yes, but the exfoliation instruction, there's no evidence here, there's no suggestion here that evidence was ever destroyed. So that's why. I mean, the cars were released to the insurance company, and with due diligence, Mr. Lloyd would probably at least ask for them. That's nowhere in the record. But it does say something, that when Mr. Cover tells his client in October of 2013, I can't find the cars, Mr. Lloyd does nothing for a year in terms of his speedy trial right. In fact, he files a speedy trial tolling motion on October 25th. He moved to suppress evidence in May of 2014. He still hasn't asserted his speedy trial right. The first time he files that motion to dismiss is a year later, September of 2014, when it's just three months to go before trial. Clean negotiations have fallen apart, and now he knows. What can I do to defend myself? It's a strategic motion at that point. He is not, quote, as the Supreme Court said in Barker, the more serious the deprivation, the more likely a defendant is to complain. He isn't complaining until a year after his arrest. That's exactly my point, Judge Motz. And so that's why I do think the third factor is relevant to the question of prejudice. If he was really prejudiced, if Mr. Cover really couldn't do anything to help this man defend himself, he would have filed a motion to dismiss immediately when Mr. Cover told him that. I mean, he was defended by the federal public defender, very good lawyers. He didn't do anything. All he really did was file a motion to toll the Speedy Trial Act. So I think it speaks volumes. You know, Judge Motz, you wrote separately in Vermont, and you noted in your concurring opinion that one of the reasons why you would have rejected the speedy trial claim in that case was that Vermont didn't file a motion to dismiss until three months before trial. That's exactly what we have here. This defendant filed his motion September 18, 2014, three months before trial. So it is not illegitimate. He wasn't prejudiced because, you know, this is Barker. The more serious the deprivation, the more likely a defendant is to complain. Mr. Lloyd is not complaining until three months before trial. In Robinson v. Whitley, which is a Fifth Circuit case, out of circuit, so it's only persuasive authority, there's a very long discussion of the third factor. In that case, Your Honors, Robinson filed repeatedly to move to dismiss. Excuse me. He waited 12 months after his arrest, just like Mr. Lloyd in this case, before filing his first motion for a speedy trial on October 25, 1991. We consider... So in Robinson, which again is a case I think this court should look at for that third factor, a year passes before the arrest and the motion to dismiss. Okay, before you sit down... Yes, Your Honor. Can we turn again to JA-79? Yes, Your Honor. And would you read the questions and answers there? This is the end of the rebuttal. And explain to me how in light of that question and answer, there isn't an opinion by their expert that in this case he could not do a reconstruction, not just relying on no photos. Yes, Your Honor. You mean right at the middle there. Can you tell us about the circumstances? Can you tell us about circumstances under which he would be able to do... One. ...a reconstruction... Right. ...without seeing the vehicle? Right, and he says sometimes... And he says sometimes to be alone. Well, maybe he's wrong, but that's what he says. Right. But when you have a case of who crossed the center line or who was within their lane of traffic at the time of impact, you must have to have a factual and scientific basis as to the point of impact and the vehicle's relationship to those lane lines. You must do what I've previously testified to. And these are not just me, but these are industry standards, guidelines, and protocol. Correct, Your Honor. So that's what he says. But I thought that you had earlier told me that he never testified that he couldn't do a reconstruction. Well, the assumption here... And the only reason he gave was that he couldn't do a reconstruction because of the photos. That's right. He never talked about anything else. That's right. But it seems to me right there he does, in fact. Right. When you have a case of a vehicle that crosses the center line, etc., you must have a factual and scientific basis. That's all it really says, as to the point of impact. And I would submit that Judge Titus made the finding that all of the other evidence that was presented to the expert, the total station, the aircraft control module, which actually gives you directional, right? There's a graph of the Delta V. I actually found it very interesting in looking at Corporal Russell's report. You can actually look at the direction that the car was going. You think that the district judge's finding was that what he had was that, even though he's saying it's not? I think the district judge made a credibility determination. Listening to the expert on the stand, recognizing that he's saying, well, if I don't have photographs, there's only certain things I can do. And based on all of the wealth of other evidence, based on the fact that Mr. Cover has done plenty of reconstructions where there weren't vehicles, I think the district judge made a credibility determination as well as a factual finding that it's not simply impossible to do a reconstruction in this case. I think that's the finding that the court made. And at trial, the government's expert supports that idea. Right? Corporal Russell testifies, and I think the court can use that testimony to support what happened at the pretrial motions hearing. But in a simple answer, though, that the limitation that he says when you can't do it doesn't exist here. This is not a lane-changing question, is it? That's right. Mr. Lloyd said the truck was in his lane. He hit him. His claim is that he braked, but he never said he was straddling the line or he came into my... The very limitation that the expert said did not exist in the case. You're absolutely right, Judge Gregory. And the question is, you know, what happened in this case? You know, Judge Gregory mentioned what Mr. Lloyd said on direct examination. I mean, I'll touch upon what he said on cross-examination. Right? What the prosecutor, Ms. Wiseman, said, and you just testified that you didn't see the pickup truck put on its brakes. Page 315, the joint appendix. Answer, no ma'am. When he put on the brakes, I must have been too close to him. He didn't even see the brakes, because he's going 100 miles per hour in the lane behind the victim, the man who was killed. So, Judge Motz, I appreciate Judge Gregory's point there. There isn't any evidence in this case that you've got... I thought that his whole thing was that there had been the switching of lanes and that this was... I take your point at the end, there wasn't the switching of lanes, but up until this, people were switching lanes. Well, let me ask you one question. This is just... I'm just curious about how this was all created. Why was there a supplemental joint appendix? Why wasn't all that stuff in the original joint appendix? I can't answer that. I think the reason why... I'll ask your colleague on the other side. I just thought it was just very odd. I think the reason, Your Honor, and I think Mr. Fincy probably knows the answer, because I did not actually brief this case. My understanding is that there was a bunch of trial testimony that was not included in the original joint appendix. Mr. Abbott testified, he was one of the... Right, right, I know what was in there, but I don't know why it wasn't in there. Why it was not in there? I don't know. Correct. So either we requested it and it wasn't put in, or we dropped the ball and didn't request it and realized that we should have. Okay. So we do apologize for that, Your Honor. Okay. So for all those reasons, Your Honor, we do appreciate the court's time. I would just say at the very end here, the Supreme Court, in Barker, pointed out that dismissal on speedy trial grounds is a severely... I want to make sure I get my language right. Is a... highly... No, it's severely... Sorry. Unsatisfactorily severe remit of dismissal. And we certainly don't believe that this case, where a man was killed through the negligent... Excuse me, through the reckless acts of the defendant in this case, justifies the unsatisfactorily severe remedy of dismissal. Thank you very much, Your Honors. Thank you, Your Honors. I don't want to spend too much time on this, but I think it's worthy of addressing because the government has harped on it so... The period before that 15-month delay... I'm sorry, after the 15-month delay does not matter. That 15-month delay is all that matters. However, they make a big deal of making this speedy trial motion two months before trial. There's something Your Honors do not know, and that's that the government's expert could not determine a cause of the accident until two months before trial. At that point, no one was going to trial with an expert who said, here's how the accident happened. Two months before trial, they gave the evidence back to their expert and say, can you try harder? And you look at the same things and see what you can come up with. They had two experts. They had two experts. The speed man was on board. Both were hired immediately before trial. Both were hired on the eve of the speedy trial motion being filed. This all happened at the same time. So the prejudice to the defendant in not being able to present the cause of the accident accrued when they had an expert who was then going to tell us about the cause of the accident. Back in October 2013, when Appellant's expert said he couldn't find the vehicles, that they were gone, and they were apparently released to the insurance company, why didn't Appellant go to his insurance company to look for the vehicle? Frankly, I didn't represent him at that time. He was represented by a different counsel, but I do know that the government notified us that the vehicles had been destroyed and we used that, or had been released to the insurance company. Right, that was going to be my question. It's not destroyed. It is released to the insurance companies, to Appellant's insurance company. More than a year before the trial, so an Appellant's insurance company and the other vehicle was released to the decedent's insurance company. We have no idea what happened to that vehicle. But that does get to my point that the court has been asking about whose burden is it to prove prejudice. And I think it's important to note here... It's your burden. Well, we all agree on the first four Barker factors. Everyone, even the government, says the first three Barker factors weigh in favor of the defense. We all know that. So if this court were to find that there was no speedy trial violation here, it would be tantamount to saying only prejudice matters. And if only prejudice is going to matter under the Barker v. Wingo analysis, isn't it too high a burden to ask the defendant to prove a negative? To ask the defendant to say what they would have done with evidence that the government released and should have held. I think we all agree that the government could have... No, it's a sliding scale. The longer it is, the less you have to show to make it to the point where it's dogged, it's per se. But when you're in the gray area and you have 15 months and you've got neutral factors, you don't claim there was an intentional delay. We have to weigh what the prejudice was. And in this case, the limitation your expert said was that I could do speed, but I couldn't do a reconstruction if there's a question of who was in whom lane at the time. That's not the case here. You conceded that your client was going 100 miles an hour. My question is this. Do you contend that your client had to be the sole proximate cause to be guilty under the statute? No, and Your Honor has honed in on something that the district court had honed in on as well. First of all, we did not concede the 100 miles per hour. You conceded the 79 because you had to concede it. And we conceded speeding. He testified to speeding. He's admitted to that all along. I thought you had no objections to the testimony of that expert that he said was 100 miles an hour. Is that not correct? We didn't stipulate it to him. Well, it's the same thing, isn't it? You had no objection to it? Respectfully, it's not. We said that he... Tell me the difference. He had an adequate basis to testify to that, but we were going to cross-examine him on it. You put no expert on... Our expert was unable to give... No, no, no, no. No, no, no. No speed experts. No speed experts. And then you did not object to it. That's the same thing as a stipulation, basically, isn't it? We cross-examined him on his determination. We talked about... Cross-examination is nothing that's not evidence. The evidence was he's going 100 miles per hour and you didn't object to that conclusion. And yes, you did, you know, go around the edges and cross-examine him, but that's a fact that couldn't be removed from the case. Well, Your Honor, even if we had, even if we had stipulated to that 100 miles per hour, I think it's important to know, and the district court judge was focused on this as well, speed is not a cause of an accident. It's not? Speed alone is not a cause of an accident. And the accident reconstructionist testified to this. Wait a minute. You're driving a 3,000-pound vehicle and you're going 100 miles an hour and you said speed had nothing to do with an accident? Not that it had nothing to do with it. Certainly not. The other court have been backing up, it seems to me, which there's no... It could be a contributor. There's no suggestion of that. But would that change the outcome if he contributes? Well, the other, the main point here is that speed is not gross negligence. Speed alone is not necessarily gross negligence. And what the government needed to prove was gross negligence. But the evidence from the witnesses were... I don't see why you... It looks to me like neither side needed an expert in this case because the fact witnesses said they were zooming like this and they said to themselves, somebody's going to get killed. Because he said, I pressed on the gas because he said he was gone. I pressed on the gas to catch up with him knowing he was going really fast. So you have to be admitting that I'm going really, really, really fast. And it was only a mile away from the accident. So therefore, he covered that ground within one mile chasing somebody behind someone going really, really fast. That's his own evidence. Your Honor, the jury may well have found if there was another contributing factor that it was negligence. Like what? Like what? Like the backing up example that Judge Moxley... Nobody suggested that. Yeah. I mean, seriously. Well, the hypothetical. No, not even the hypothetical. The best you could do is he was braking. Nobody suggested any backing up. If he was braking and changed lanes quickly, if there was some other... But there's no evidence. Your client said he was in his lane and then he braked while I was going behind him. That's not the case. Prejudice has to be weighed in light of the facts of the case. And again, Your Honor, I would just say we don't know what this expert could have found if he examined the vehicles. That's where the prejudice comes up here. That there could have been other contributions to the accident that would weigh against gross negligence and we weren't able to present those things to the jury. And that's the unfairness that Barker and Doggett talk about. This trial was skewed due to that delay. Thank you, Your Honor. Thank you very much. We will come down and brief the lawyers and then go directly to our next case.
judges: Diana Gribbon Motz, Roger L. Gregory, Stephanie D. Thacker